UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

Case No.: 08-22401-CIV-COOKE/BANDSTRA

CARNIVAL CORPORATION,
a Panamanian corporation

    Plaintiffs,

vs.

U.S. BANK NATIONAL ASSOCIATION ND,
a federally chartered banking association,

    Defendant.
_____/

**CARNIVAL'S REPLY MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Stuart H. Singer, Esq.
William T. Dzurilla, Esq.
Markenzy Lapointe, Esq.
BOIES, SCHILLER & FLEXNER LLP
401 E. Las Olas Boulevard
Suite 1200
Ft. Lauderdale, Florida 33301
(954) 356-0011 - Phone
(954) 356-0022 - Facsimile

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... i

I.   INTRODUCTION ........................................................................................................ 1

II.  THE MATERIAL FACTS ARE NOT DISPUTED ................................................... 1

III. US BANK IMPROPERLY FAILED TO PAY THE REBATES, ENTITLING
     CARNIVAL TO SUMMARY JUDGMENT ............................................................ 2

     A.   The Parties' Continued Performance of the Agreements During the Transition
          Continued the Rebate Provisions ...................................................................... 2

          1.   The Presumption of Contract Continuation Applies ........................ 2

          2.   US Bank Has Failed to Overcome the Presumption ......................... 3

     B.   US Bank Expressly Agreed to Continue Carnival's Program, Including the
          Rebate Provisions, During the Transition ......................................................... 6

     C.   US Bank Is Obliged to Pay the Rebates Under Principles of Promissory Estoppel ..... 7

     D.   US Bank Is Obliged to Pay the Rebates Earned by All of Carnival's Affiliates,
          Including Princess .............................................................................................. 8

IV.  CARNIVAL IS ENTITLED TO $2.951 MILLION IN DAMAGES .................... 9

CONCLUSION ....................................................................................................................... 10

# TABLE OF AUTHORITIES

**Page**

**Cases**

*American Medical Intern., Inc. v. Scheller*,
  462 So.2d 1 (Fla. 4th DCA 1984) .................................................................................. 6

*Cloverdale Equip. Co. v. Manitowoc Eng'g. Co.*,
  964 F. Supp. 1152 (E.D. Mich. 1997) ............................................................................ 3

*Fla. Dep't of Health & Rehab. Servs. v. S.A.P.*,
  835 So.2d 1091 (Fla.2002) ............................................................................................. 9

*Foundation Property Investments, LLC v. CTP, LLC*,
  186 P.3d 766 (Kan. 2008) ............................................................................................... 8

*LaMore Restaurant Group v. Akers*,
  748 N.W.2d 756 (S.D. 2008) ......................................................................................... 6

*Luden's Inc. v. Local Union No. 6*,
  28 F.3d 347 (3d Cir. 1994) ........................................................................................ 2, 3

*Oleg Cassini, Inc. v. Couture Coordinates*,
  297 F. Supp. 821 (S.D.N.Y. 1969) ............................................................................. 8, 9

*Sullivan v. Colorado Boxed Beef Co.*,
  2006 WL 1883447 (M.D. Fla. 2006) ............................................................................. 3

*Topp, Inc. v. Uniden America Corp.*,
  2007 WL 4218998 (S.D. Fla. 2007) ............................................................................... 5

*Transpower Constructors v. Grand River Dam Authority*,
  905 F.2d 1413 (10th Cir. 1990) ..................................................................................... 9

*U.S. v. TRW Rifle 7.62X51mm Caliber*,
  447 F.3d 686 (9th Cir. 2006) ......................................................................................... 5

*Visiting Nurse Ass'n v. VNAHealthcare*,
  347 F.3d 1052 (8th Cir. 2003) ....................................................................................... 6

**Statutes**

Fla. Stat. 672.209(5) .............................................................................................................. 8

I.      INTRODUCTION

US Bank's opposition does not dispute any of the key facts: 1) US Bank told Carnival that its credit card "program" would be continued during Carnival's transition to BoA, 2) US Bank did not disclose its intent to withhold rebates until eight months later, 3) until US Bank informed Carnival of its intent, the parties continued to perform, with Carnival spending over $200 million on the cards, and 4) US Bank avoided contact with Carnival to "keep them spending" and avoid a "rebate discussion."  These undisputed facts entitle Carnival to summary judgment under established legal principles of contract continuation, express contract, and promissory estoppel.

II.     THE MATERIAL FACTS ARE NOT DISPUTED

The email exchange of November 8, 2007, is undisputed.  US Bank offered to continue to "service you and your brands" during Carnival's transition to BoA "up to and including the last day of your program," even if the transition lasted longer than 90 days. Zacharski Decl., Ex. H. Carnival replied that the transition would likely take longer than 90 days and thanked US Bank for the extra time.  Zacharski Decl., Ex. I.

It is uncontested that "your program", *i.e.*, the Carnival program, included rebates based on volume and timely payment.  The rebates undisputedly were a "prime factor" of the program, Buchleitner Dep. at 14, the "key feature of all three agreements," Zacharski Decl. ¶ 4, and the "primary purpose" for their existence.  Declaration of Charles Nauen ("Nauen Decl."), Ex. 3 at 33-34.  A promise to extend the program without including the rebates would be like a promise to extend a car rental without including the car's engine.

Although US Bank has submitted a declaration from Joyce Buchleitner, in which she claims that she only intended to "keep the credit cards open" and not to extend the contracts, US Bank does not contend that she communicated any such intent to Carnival.  Moreover, her November 8 email does not say that just the cards would be continued, it says that Carnival's "*program*" would be continued.  The Agreements constituted Carnival's *program*.  *See* Nauen

1

Decl., Ex. 1 ("Corporate Card *Program Agreement*"); Ex. 2 ("Purchasing *Program Agreement*"); Ex. 4 (Central Travel System *Program Agreement*") (emphasis added).

It is undisputed that US Bank did *not* disclose its intent to discontinue rebates until July 2008, after Carnival had spent over $200 million on the US Bank cards.  US Bank claims it did not need to disclose this critical fact, but that is a pure legal question for this Court to decide.

The June 2008 emails between Ms. Buchleitner and her supervisor, Robert Hern, are also uncontested, as is Ms. Buchleitner's and Mr. Hern's testimony that they avoided contact with Carnival and its affiliates for the specific purpose of "keeping them spending" with US Bank for as long as possible.  Buchleitner Dep. at 47, 49-51 and Ex. 3; Hern Dep. at 135.[1]  Although US Bank blithely says there was "nothing nefarious" about what Ms. Buchleitner and Mr. Hern said and did, Opp. at 19 (mentioning only the emails and not the testimony), their documents and testimony are smoking guns that speak for themselves.

### III.   US BANK IMPROPERLY FAILED TO PAY THE REBATES, ENTITLING CARNIVAL TO SUMMARY JUDGMENT

#### A.   The Parties' Continued Performance of the Agreements During the Transition Continued the Rebate Provisions

##### 1.   The Presumption of Contract Continuation Applies

We showed in our opening brief, and US Bank does not dispute, that, in Florida and elsewhere, "when a contract lapses but the parties to the contract continue to act as if they are performing under a contract, the material terms of the prior contract will survive intact unless either one of the parties *clearly and manifestly* indicates, through words or through conduct, that it no longer wishes to continue to be bound thereby, or *both parties mutually intend* that the terms not survive." *Luden's Inc. v. Local Union No. 6*, 28 F.3d 347, 355-56 (3d Cir. 1994) (emphasis

---

[1] **Q.  [W]as it your belief that if you called Carnival and brought up the rebate discussion, that meant they would learn from you that you weren't planning to pay them a rebate and they would stop their spending?**
  **A.  Well, that would probably be true.**
  **Q.  And you wouldn't want that to happen?**
  **A.  Right.**
  **Q.  And so that's why you didn't call on June 28th, correct?**
  **A.  Correct.**
Buchleitner Dep. At 47 (objection omitted).

2

added), and other cases and treatises cited in our opening brief at pp. 6-7. This rule applies unless the defendant proves affirmatively that a reasonable person would believe that the contract's terms had changed, or that "*both parties* understood that the previous agreement's terms were not to apply to the continued service." *Sullivan v. Colorado Boxed Beef Co.*, 2006 WL 1883447, *2-3 (M.D. Fla. 2006) (emphasis added).

US Bank's response is that this rule does not apply if one party sends a termination letter. The only authority cited by US Bank for this proposition is *Luden's*, *supra*, where the defendant *did* send a notice letter, the court *did* apply the presumption, and the lapsed agreement was held to have been impliedly extended. 28 F.3d at 355-56. Nothing in the case law or treatises limits the presumption to instances where a contract expired without a termination letter.

The rule proposed by US Bank, which is unsupported by any authority, makes no sense. The clear legal policy expressed in the legal presumption is that when the parties continue their relationship, regardless of the reason, despite the lapse of the contract that governed that relationship, the terms of the prior contract are presumed to govern their relationship, particularly where, as here, the relationship "by its nature generally implies that some mutually agreed upon rules govern its configuration." *Id*. *Cloverdale Equip. Co. v. Manitowoc Eng'g. Co.,* 964 F. Supp. 1152, 1162 (E.D. Mich. 1997) (applying Florida law) (implied agreement incorporating same material terms as the expired agreement created by parties' continuation of "business as usual").

### 2. US Bank Has Failed to Overcome the Presumption

US Bank next argues that it has evidence from which a reasonable fact-finder could find that it overcame the presumption. However, the evidence on which US Bank relies does not support US Bank's position at all, let alone prove "clearly and manifestly" that US Bank no longer "wished to continue to be bound" by the Agreements' rebate provisions. *Luden's*, *supra*.

First, US Bank asserts that Carnival's Paul Zacharski testified that he "understood US Bank to have offered to keep the accounts open so Carnival could continue its operations during the transition," and that this somehow proves that "both parties understood that the previous

3

agreement's terms were not to apply to the continued service." Opp. at 8.  However, Mr. Zacharski's testimony makes clear repeatedly that the discussion involved keeping the program in place, not just keeping the credit cards open. Mr. Zacharski's testimony, even in the very passage cited by US Bank, was that the discussion was about "continuing the contracts," and that Carnival's intent was to be able to "use a credit card and make sure we were able to get some type of rebate continuously throughout this [transition] period." Nauen Decl., Ex. 3, at 31-34.  This testimony does not create any triable issue of fact.

US Bank next argues that Carnival should have known it would not get rebates during the transition because the rebate provisions of the Agreements state that rebates will "cease" when the Agreements are terminated.  Opp. at 9.  But this simply begs the question by incorrectly assuming that the Agreements had terminated when in fact the parties continued to perform.  As the Agreements had been expressly and impliedly extended, US Bank was obliged to continue paying the rebates, because there was no "termination."  Indeed, US Bank has admitted that the "only difference" in its post-2007 handling of Carnival was that it "didn't pay the rebate"[2]

US Bank's next contention is that it "sent clear and repeated signals that the scope of the relationship had changed."  Opp. at 9.  In essence, the bank is saying, "We didn't tell you we were discontinuing the rebates, in fact we concealed this fact from you, but you should have been able to figure it out anyway, because we stopped sending you a document that does not even mention rebates."  US Bank's position should be firmly rejected.

The so-called "clear and repeated signal" was Ms. Buchleitner's newly alleged discontinuance of her monthly emails attaching Customer Activity Reports (CARs).  It is

---

[2]  **Q.  Is there anything, other than not paying Carnival a rebate, that you did differently in handling Carnival after December 31, 2007?**
  **A.  No.**
  **Q.  So the only difference is, you didn't pay the rebate?**
  **A.  Correct.**
Buchleitner Dep. at 67 (emphasis added).

4

undisputed that the CARs do not mention rebates, Opp. at 10, and that US Bank continued to send some CARs to Carnival at least until March 2008. Buchleitner Decl., Ex. 3.

Ms. Buchleitner's declaration (that she changed her handling of the Carnival account by discontinuing the CARs) is directly contrary to her unequivocal deposition testimony that, in 2008, she handled the Carnival account exactly as before, except for discontinuing the rebate payments, Buchleitner Dep. at 67 (quoted at note 2 *supra*), and she does not explain the contradiction. US Bank may not defeat summary judgment by submitting a declaration that, without explanation, contradicts the declarant's prior deposition. *Topp, Inc. v. Uniden America Corp.*, 2007 WL 4218998, *1 n.1 (S.D. Fla. 2007); *U.S. v. TRW Rifle 7.62X51mm Caliber*, 447 F.3d 686, 692 n.10 (9th Cir. 2006).

In any event, US Bank's only explanation for why the CARs are even relevant to rebates is its disingenuous statement, citing Paul Zacharski's testimony, that Carnival "would use these reports in calculating its rebates on a monthly basis." Opp. at 10. It is true that Mr. Zacharski stated that the CARs were "most likely" used by Carnival's staff to calculate rebates (he did not say "on a monthly basis"), but US Bank knows perfectly well, because it deposed the individuals who actually calculated the rebates for Carnival, that the CARs were *not* used to calculate any rebates. *See* Declaration of William Dzurilla ("Dzurilla Decl."), Ex. 2 at 30, 32 ("I never really used them, and some of them I didn't even open); Nauen Decl., Ex. 14 at 22-23 (source data for rebate calculations came from the actual monthly bills or the Access On-line system).

The other documents cited by US Bank, such as the alleged "preliminary rebate calculation," by US Bank's own admission would not have been sent, at the very earliest, until mid-April 2008, several months *after* Carnival had used the US Bank cards to spend tens of millions of dollars. And, although US Bank asserts that Carnival should have been more "diligent" about raising the issue as soon as the first 2008 rebate check, due at the end of May 2008 (Nauen Decl., Ex. 14 at 25), failed to arrive, in fact Carnival did raise the rebate issue on

5

June 26, less than 30 days after the due date, and US Bank failed to respond.[3] US Bank did not admit it was withholding the rebates until July 16, five days after Carnival's *second* rebate inquiry.

The burden was on US Bank to "clearly and manifestly" tell Carnival that it would no longer pay rebates (not on Carnival to discern US Bank's concealed wrongdoing). All US Bank had to do was to say, "We will honor the cards but you will not get rebates." Its failure to do this means the presumption applies and the terms of the Agreements continued to govern, including the rebate provisions that were central to the program.

### B. US Bank Expressly Agreed to Continue Carnival's Program, Including the Rebate Provisions, During the Transition

With respect to whether the November 8 email exchange created a binding express agreement to extend Carnival's program during the transition, US Bank agrees that this issue is to be judged by an "objectively reasonable standard." Opp. at 6. Regardless of either party's private, subjective intentions, a contract is formed if the writing shows "agreement on two sets of external signs – not on the parties having meant the same thing, but on their having said the same thing." *Id*. (citation omitted.) This is a pure question of law which the Court may decide on summary judgment, and US Bank cannot create a fact issue by proffering a "fanciful" interpretation of the emails. *American Medical Intern., Inc. v. Scheller*, 462 So.2d 1, 7 (Fla. 4th DCA 1984). See *LaMore Restaurant Group v. Akers*, 748 N.W.2d 756, 761 (S.D. 2008) (consent to contract is a question of law to be judged on the objective facts); *Visiting Nurse Ass'n v. VNAHealthcare*, 347 F.3d 1052, 1054 (8th Cir. 2003) (the court "looks to the parties' objective manifestations of intent and interprets those manifestations as a reasonable person would," and finds a binding agreement if "those manifestations produce a reasonably ascertainable objective meaning").

Thus, the Court can and should resolve this issue by looking at the two November 8 emails and deciding, based on these "external signs" whether there was an agreement to extend

---

[3] US Bank cites Erica Brown's statement that she should have discovered the non-receipt of the rebate payment by "the end of June" but did not do so due to "an oversight." However, Carnival's Delilah Owen had explicitly raised the issue with US Bank by June 26, Zacharski Decl. ¶ 13, yet US Bank still failed to confess its intent to withhold rebate payments until July 16.

6

Carnival's "program" (including the rebates, not just the validity of the credit cards).  US Bank contends that the emails were too "vague" and "ambiguous" to create an agreement, but Carnival submits they could hardly be clearer.

There were no conditions, no unclear language, no suggestion of a need for further documentation, just a simple *assurance* that US Bank would continue Carnival's "*program*" throughout the transition, and a simple "thank you, we will need the extra time" in reply.  And of course, there was nothing in US Bank's email that even remotely implied the discontinuance of Carnival's rebates, which undisputedly were a "prime factor" in the program, the "primary purpose" for its existence, and the "key feature" of the Agreements.  The November 8 email exchange therefore constitutes a binding agreement to extend the termination date of the Agreements.

    **C.**    **US Bank Is Obliged to Pay the Rebates Under Principles of Promissory Estoppel**

US Bank contends there is a fact issue whether Carnival relied on the bank's promise to continue Carnival's program during the transition.  However, US Bank fails to mention the testimony of its own officers, who admitted their knowledge that, if Carnival and its affiliates learned that rebates would not be paid, they would "stop their spending" with US Bank.  Buchleitner Dep. at 47 (quoted at note 1 *supra*).  US Bank did not want that to happen, and for that *specific reason* US Bank avoided contact with Carnival.  *Id*.  As long as US Bank was continuing to "get volume return from the relationship with Carnival," it was "not going to inform them that they were not going to get any rebates."  Hern Dep. at 135.[4]

---

[4] Mr. Zacharski testified without contradiction that Carnival relied on US Bank's promise by continuing to use the US Bank cards freely and that the transition to BoA would have been accelerated had US Bank told Carnival that it would stop paying rebates.  Zacharski Decl. ¶ 12.  US Bank misleadingly attempts to create a fact issue by citing the testimony of Carl Huni, a lower-level Carnival employee, who testified he did not know of anything Carnival could have done to accelerate the transition.  However, Mr. Huni also plainly testified that he had no personal knowledge of the reasons for the delay in the signing of the BoA contracts, as that was "above and beyond my level of involvement."  Nauen Decl, Ex. 6, at 32.

In view of Carnival's admitted reliance and US Bank's patently unjust concealment of its decision, Carnival should be awarded summary judgment on promissory estoppel grounds.

### D. US Bank Is Obliged to Pay the Rebates Earned by All of Carnival's Affiliates, Including Princess

US Bank does not dispute that it 1) issued CTSA cards to Princess, 2) paid Princess its CTSA rebates from 2003 through 2007, almost five full years, 2) waived the participation addendum requirement for those five years, 3) *explicitly* advised Carnival in writing that it *did have* a CTSA participation addendum for Princess, 4) created the entire situation by sending the wrong form, and 5) assured Carnival that US Bank would continue to "service you ***and your brands***" (with no exclusion of Princess) during the transition. Nevertheless, US Bank asserts that it can now retroactively "unwaive" its waiver, without the slightest notice, and deny Princess its 2008 rebates.

US Bank's position is baseless, as only a waiver "affecting an *executory* portion of a contract" may be retracted. 13 Williston on Contracts § 39:20 (4th ed.). A retraction requires advance notice to the other party that performance of any term waived will thereafter be required. *Id*.

Where, as here, "a party entitled to performance of certain contract terms or conditions has led the other party to believe that performance will not be required until it has become too late to perform, the person who has so conducted himself or herself is barred from asserting the right to performance which has been waived." *Id*. *Accord*, *e.g.*, Restatement (2d) of Contracts § 84(2) & comment F; Fla. Stat. 672.209(5) (Fla. UCC); *Foundation Property Investments, LLC v. CTP, LLC*, 186 P.3d 766, 776 (Kan. 2008); *Oleg Cassini, Inc. v. Couture Coordinates*, 297 F. Supp. 821, 830-31 (S.D.N.Y. 1969) (same).

Contrary to US Bank's suggestion, a "no waiver" clause, such as ¶10(b) of the CTSA, does not have the effect of allowing retroactive waivers. 3A Corbin on Contracts § 763 (rev. ed. 1960) ("a provision that an express condition of a promise or promises in the contract can not be

8

eliminated by waiver, or by conduct constituting an estoppel, is wholly ineffective"); Williston, supra, §§ 39:20, 39:36; *Transpower Constructors v. Grand River Dam Authority*, 905 F.2d 1413, 1419 (10th Cir. 1990); *Oleg Cassini*, *supra* (the requirement of advance notice of retraction "is not obviated by or inconsistent with a clause in a contract providing that a waiver shall not constitute a continuing waiver").

Finally, US Bank asks the Court to utterly disregard its explicit written statement that it had a CTSA participation agreement for Princess, purportedly because Carnival did not allege that it relied on this representation. Obviously, if US Bank would have told Carnival (in response to Carnival's *direct* inquiry) that it did not have a CTSA participation addendum for Princess, and that the lack of this form jeopardized Carnival's right to millions of dollars of rebates, Carnival would have immediately rectified the situation. Equitable estoppel is applied "on principles of fair play and essential justice and arises when one party lulls another party into a disadvantageous legal position." *Fla. Dep't of Health & Rehab. Servs. v. S.A.P.,* 835 So.2d 1091, 1096 (Fla.2002).[5]

## IV.     CARNIVAL IS ENTITLED TO $2.951 MILLION IN DAMAGES

With respect to damages, US Bank only takes issue with the $320,840 attributable to the May 2008 spending by Carnival affiliates Princess and Cunard. However, Carnival is entitled to this $320,840, because there is no evidentiary support for US Bank's claim that the payments for that month were "untimely."

US Bank bases its "untimeliness" claim on two incorrect statements that are directly contrary to the pertinent documents. First, US Bank asserts that a May 26 "cycle date" is "indicated by" the date on the paper account statements, which Carnival undisputedly did not receive until June 2, just *three days* before the alleged June 5 due date for payments totaling over $23.8 million (Princess and Cunard undisputedly paid on June 6). In fact, the paper statements say

---

[5] US Bank suggests it is entitled to summary judgment on this and other issues. This request should not be considered, because it is untimely under this Court's Scheduling Order and is not compliant with the requirements of Local Rules 7.1 and 7.5. While the issues discussed in text prove that Carnival, not US Bank, is entitled to summary judgment, US Bank does not even discuss other grounds that would defeat its motion, such as the amended complaint's reformation count.

9

that May 26 is the "Statement Date" (with a due date of *June 16*), and there is *nothing* in these statements mentioning a "cycle date," a "closing date," or a June 5 rebate qualification deadline. *See* Buchleitner Decl., Ex. 4.

Second, and even more importantly, the emailed spreadsheet statements, which were emailed on May 28, *do* state *expressly* that the "Closing Date" or "Cycle" date was May 29, *not* May 26. Dzurilla Decl., Ex. 1. US Bank has no explanation for this, and Carnival surely cannot be penalized for paying based on what the bank sent it. And, contrary to US Bank's contention, the balance due set forth on the emailed statements is *exactly* the same as the payment amounts and the amounts stated on the paper statements, *e.g*., $9,444,120.29 for account number ************9131.[6] *Id.*

US Bank cannot run away from its own emailed spreadsheet statements, which plainly show that the May 2008 payments were timely.[7] US Bank's reliance on the paper statements, which do not mention a "cycle date" or "closing date," and which Carnival did not use and did not even receive until June 2, should be rejected as a matter of law. Carnival should summarily be awarded the entire **$2,951,173** to which it is entitled.

## CONCLUSION

For all of the reasons set forth above and in our opening brief, Carnival's motion for summary judgment should be granted.

---

[6] US Bank apparently made this latter contention because, unfortunately, due to an error in the printing of our original exhibit containing the emailed May 2008 statements (Zacharski Decl., Ex. N), a portion of the document, including the "Balance Due" column, was somehow cut off. A copy of the complete document is attached, Dzurilla Decl., Ex. 1. We regret the error, although this is US Bank's own document, and it should have been aware of its content before accusing Carnival of making "tardy" payments and "post hoc rationalizations."

[7] In the context of questioning on a wholly unrelated topic, Carnival's Erica Brown was asked, "Is it your understanding that the cycle date is the statement date?" She answered, "That's correct." There is nothing in her testimony that even remotely suggests she was referring to the paper statements rather than the emailed statements, or attempting to resolve any conflict between the differing dates on the two statements. Her testimony does not support US Bank's position at all.

10

Dated: September 10, 2009       Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Markenzy Lapointe
Stuart H. Singer
Florida Bar No.: 0377325
William T. Dzurilla
Florida Bar No.: 0757861
Markenzy Lapointe
Florida Bar No.: 0172601
401 E. Las Olas Boulevard, Suite 1200
Ft. Lauderdale, Florida 33301
(954) 356-0011 - Phone
(954) 356-0022 - Facsimile

## CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served on all counsel of record and pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those parties not authorized to receive electronically Notices of Electronic Filing.

/s/ Markenzy Lapointe

## SERVICE LIST

**Carnival Corporation v. U.S. Bank National Association, ND**
**Case No.: 08-22401-CIV-COOKE/BANDSTRA**
**United States District Court, Southern District of Florida**

**Miami Division**

Alejandro Alvarez, Esq.
THE ALVAREZ LAW FIRM
355 Palermo Avenue
Coral Gables, Florida 33134
Telephone: 305-444-7675
Facsimile: 305-444-0075
alex@floridatrialteam.com

*Attorney for Defendant U.S. Bank National Association, ND*

Charles N. Nauen, Esq.
William A. Gengler, Esq.
David J. Zoll, Esq.
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: 612-339-6900
Facsimile: 612-339-0981
Email: cnnauen@locklaw.com
Email: wagengler@locklaw.com
Email: djzoll@locklaw.com

*Attorneys for Defendant U.S. Bank National Association, ND*