UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 08-22401-CIV-COOKE/BANDSTRA

CARNIVAL CORPORATION,

    *Plaintiff*,

v.

U.S. BANK NATIONAL ASSOCIATION ND,

    *Defendant*.

_____/

## ORDER ON MOTION FOR SUMMARY JUDGMENT

This matter is before me on Plaintiff's Motion for Summary Judgment [D.E. 25], filed on August 14, 2009, Defendants' Opposition to Plaintiff's Motion for Summary Judgment [D.E. 28], filed on August 31, 2009, and Plaintiff's Reply in Support of its motion [D.E. 33], filed on September 10, 2009. I also heard oral argument on this matter on October 7, 2009. For the reasons set forth below, I am granting Plaintiff's Motion for Summary Judgment.

### *I. UNDISPUTED FACTUAL BACKGROUND*

Plaintiff Carnival Corporation ("Carnival") began its contractual relationship with Defendant U.S. Bank National Association ND ("US Bank") in 1994. Carnival and US Bank entered into three agreements: the Purchasing Program Agreement ("PPA"), Corporate Card Program Agreement ("CCPA") and Central Travel System Program Agreement ("CTSA"). Under the agreements, US Bank agreed to issue Visa credit cards to Carnival employees, which were used to purchase goods and services for Carnival and its affiliates. US Bank also provided rebates to Carnival and its affiliate cruise lines (Princess Cruise Lines, Cunard Lines, Holland America Lines, and Costa Cruises) based on specified volumes of charges and prompt payment. The rebate payments

amounted to several million dollars each year.

The CTSA, which accounts for over ninety-five percent of Carnival's alleged damages, became effective on January 1, 2003. The CTSA provides that:

> "This CTS Agreement shall remain in full force and effect for an initial term of five (5) years from the Effective Date of this CTS Agreement... After the initial term, upon payment by Customer of its annual fee, this CTS Agreement shall remain in effect until terminated (I) by either party upon sixty (60) days prior written notice..."

The attached Performance Volume Rebate Addendum provides that the "Addendum shall terminate upon termination of the CTS Agreement and all rights hereunder shall cease." The PPA, which became effective March 31, 2003, contained an identical five (5) year initial term, but required a ninety (90) day prior written notice for cancellation. The rebate addendum to that agreement contained a termination provision identical to the CTSA addendum. Under the PPA, "[a]ll Purchasing Cards, CPAs and related accounts shall be deemed canceled effective upon termination of this Agreement." Finally, the CCPA became effective on November 17, 1997 and, after a three year initial term, could be terminated by either party upon ninety (90) days prior written notice. The rebate addendum to the CCPA also terminated upon termination of the agreement. The CCPA further provided that, "[a]ll Corporate Cards and accounts shall be deemed canceled effective upon termination of this Agreement." Amendment B-I to the CCPA adds that "[l]iability for all earned rebates shall succeed termination of this agreement."

On November 2, 2007, Carnival's Senior Vice President of Finance & Administration, Paul Zacharski, sent US Bank a letter informing it of Carnival's decision to switch to a different primary credit card processor. The letter stated that it was intended to "serve as [Carnival's] official 90 day notice of termination." In response, US Bank sent an email to Mr. Zacharski, offering to "continue to service [Carnival] to the highest quality up to and including the last day of [its] program" if

Carnival's discussions with its new provider surpassed the 90 day termination period. US Bank also asked Carnival to let it know, in writing, when it determined "the specific date for the termination of the US Bank program for each product." Mr. Zacharski responded, "I do expect that the transition will take longer than 90 days and appreciate the extra time." No specific termination date was provided.

US Bank stopped paying rebates to Carnival for all programs after January 1, 2008, although Carnival continued to use its credit cards. By July 2008, Carnival employees had made over two hundred million dollars in purchases on their U.S. Bank credit cards. On June 26 and July 11, 2008, Carnival employees sent emails to US Bank, inquiring about the first quarter rebate for that year. On July 16, 2008, US Bank responded by stating that "[t]he contract between Carnival Corporation and US Bank expired on 01/01/2008... [and the] last rebate was paid through that date." This was the first time that US Bank advised Carnival that it would not pay rebates for Carnival's 2008 spending. Shortly thereafter, on or about August 1, 2008, Carnival filed the present action against US Bank. In its Amended Complaint [D.E. 24] Carnival seeks damages for breach of the three agreements (Counts I-III), breach of implied-in-fact contract (Count IV), promissory estoppel (Count V), and unjust enrichment (Count VI).

## II. LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). According to the U.S. Supreme Court, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1984) (stating "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts").

### III.  ANALYSIS

**A.     Liability**

Carnival contends that US Bank expressly agreed to continue the agreements, and its failure to pay rebates constituted a breach of those agreements. I agree. Under Florida law, where the language of an agreement is unambiguous, the legal effect of that language is a question of law and, as such, may be decided by the court. *Maccaferri Gabions, Inc. v. Dynateria Inc.*, 91 F.3d 1431, 1439 (11th Cir. 1996). Defendant contends that the email exchange between US Bank and Carnival does not reflect a "true meeting of the minds" and therefore cannot provide the basis for an extension of the Agreements. I find this argument unpersuasive, in light of the language used by US Bank's employee in the email exchange. US Bank's Relationship Manager, Joyce Buchleitner, specifically offered to continue the program past the ninety days in her email response to Mr. Zacharski's ninety day notice of termination.[1] Furthermore, Ms. Buchleitner requested that Carnival let US Bank know,

---

[1] The email stated, in relevant part:
"Typically over the next ninety days you will be going through an implementation plan and contractual negotiations with your new provider. Please be assured that if these discussions surpass the 90 days, we will continue to service you to the highest quality up to an including the last day of your program.

in writing, when "the specific date for the termination of the U.S. Bank program for each product..." was determined. It would have been illogical to make this request if US Bank considered the program terminated as of December 31, 2007, as it now contends.[2] Given this email, I find that there was an express agreement to continue the programs beyond the initial ninety day termination period.

Moreover, the undisputed facts establish that US Bank handled the programs in exactly the same way after the ninety day period expired, with the exception of its decision not to pay Carnival any rebates, creating an implied-in-fact contract.[3] Carnival argues that, under generally accepted contract principles, when an agreement expires by its terms and without more the parties continue to perform as before, an implication arises that they have mutually assented to a new contract *containing the same provisions as the old. See e.g. Rothman v. Gold Master Corp.*, 287 So. 2d 735, 736 (Fla. 1974). Carnival's notice of termination was met with an offer to continue the program past the ninety day notice period, and the parties continued to operate in the same manner. Additionally, the PPA and the CCPA required that all of the cards issued be "deemed canceled

---

When you have determined the specific date for the termination of the U.S. Bank program for each product, air/sea, corporate and purchasing cards, please let us know in writing. If you have any concerns, I can work in helping determining the best transition date for your company."

[2]Although neither party raises this point, the PPA could not have been terminated as of that date. The PPA became effective March 31, 2003 and contained a five (5) year initial term which was not subject to termination without cause. Thus, the earliest date the PPA could have been terminated was March 31, 2008.

[3]Q Nothing changed with respect to the invoices you sent Carnival after December 31, 2007?
A Correct...
Q Is there anything, other than not paying Carnival a rebate, that you did differently in handling Carnival after December 31, 2007?
A No.
Q So the only difference is, you didn't pay them a rebate?
A Correct.
Deposition of Joyce Buchleitner, p. 67.

effective upon termination of this Agreement." Yet these cards remained in use after December 31, 2007, and US Bank made no effort to cancel them.

US Bank argues that the current case is distinguishable from those finding implied-in-fact contracts, because Carnival expressly terminated the agreements. US Bank does not cite a single case for this proposition, but attempts to distinguish *Luden's Inc. v. Local Union No. 6*, a case relied upon by Carnival. 28 F.3d 347 (3d Cir. 1994). In *Luden's Inc.*, the defendant sent a contractually required sixty day notice stating that they intended to "change, modify, or terminate" a collective bargaining agreement. *Id*. at 350. The Third Circuit opined that the rationale behind such contracts "loses some of its cogency where the contract lapses because one party terminates it." *Id.* at 356. Nonetheless, the court found that an implied-in fact-contract existed, despite the purported termination. *Id.* I also find that the parties established an implied-in-fact contract by continuing to operate under the agreement.

US Bank argues that the presumption of an implied-in-fact contract can be overcome by evidence that the terms of the contracts had changed or by proving, through facts and circumstances, that both parties understood that the previous agreement's terms were not to apply to the continued service. *See Sultan v. Jade Winds Const. Corp.*, 277 So. 2d 574 (Fla. 3d DCA 1973). But US Bank has not provided this court with any facts that establish a change in the terms of the agreements. As discussed, *supra*, US Bank continued to operate in the same manner after December 31, 2007, and it did not inform anyone at Carnival that no more rebate payments would be made after that date. US Bank has not established that both parties understood that the rebate addendums to the previous agreements did not apply in 2008. I am granting summary judgment in favor of Carnival.

**B.     Damages**

Carnival claims that it is entitled to two million, nine hundred fifty-one thousand, one

hundred and seventy-three dollars in damages ($2,951,173). US Bank, while not conceding that Carnival is entitled to any damages at all, argues that this amount should be reduced because Princess Cruise Lines ("Princess"), a Carnival affiliate, is not entitled to rebates.[4] US Bank claims that there was never a participation addendum to the CTSA that included Princess, which prohibits them from receiving rebates under that agreement. Because I have already found that the parties were operating under an implied-in-fact contract, this argument is without merit. US Bank issued CTSA credit cards to Princess, and paid rebates to Princess from 2003 to 2007. The missing participation addendum was only raised after US Bank decided not to pay any rebates for 2008. The implied-in-fact contract requires the parties to continue performing as they had under the lapsed agreement, and that included US Bank paying rebates to Princess.

Finally, US Bank argues that it does not owe Princess and Cunard Lines ("Cunard") rebates for May 2008 because their payment was late.[5] Under the CTSA, US Bank agreed to pay Carnival a volume rebate when its payments were received from Carnival within ten "Client Held Days." Client Held Days is defined in the agreement as "the actual number of days from billing cycle date to the date U.S. Bank applies payment." The parties do not dispute that Princess' and Cunard's payment was applied on June 6, 2008. Instead, US Bank argues that the statement date was May 26, 2008, which made the June 6, 2008 payment, received eleven days later, ineligible for rebate. US Bank relies on documents Carnival received by mail on June 2, 2008, which had a "statement date" of May 26, 2009. However, US Bank also emailed Carnival account spread sheets on May 28, 2008, which show a "closing date" of May 29, 2008. At oral argument, counsel for US Bank had

---

[4]The Princess Cruise Lines rebates total one million, three hundred twelve thousand, eight hundred and sixty-eight dollars ($1,312,868).

[5]A total of three hundred eight thousand, twenty-six dollars ($308,026) in rebates are at issue for May 2008.

no explanation for the disparity between the documents, which were prepared by US Bank. I agree with Carnival, who argues that any disparity in the dates should be viewed against US Bank, who prepared the documents. US Bank is not entitled to any reduction in the amount of damages requested by Carnival.

### IV.  CONCLUSION

1. Plaintiff's Motion for Summary Judgment [D.E. 25] is **GRANTED**.

2. Plaintiff is awarded **$2,951,173** in damages.

3. This case is **CLOSED.**

**DONE AND ORDERED** in Miami, Florida, this 27th day of October 2009.

_____
MARCIA G. COOKE
United States District Judge

cc
The Honorable Ted E. Bandstra
All counsel of record